## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 1:15CV614 |
| | ) | |
| $15,795.00 in U.S. CURRENCY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Plaintiff's Motion for Summary Judgment [Doc. #18]. Plaintiff United States of America ("the Government") argues that Claimant Michael Anthony Shontia Howze cannot controvert its case nor carry his burden of showing that he is an innocent owner of the defendant currency (Mem. in Supp. of Gov't's Mot. for Summ. J. at 2 [Doc. #19]). For the reasons explained herein, the Government's Motion is granted.

I.

A.

The following facts are undisputed. On January 7, 2015, at approximately 10:59 a.m., while traveling north on I-85 in Davidson County, North Carolina and conducting preventive patrol duties, North Carolina State Trooper Marcus J. Ward noticed a Nissan Maxima initially decrease speed to below the posted speed limit and thereafter leave its lane briefly and follow another car at a distance of two car lengths while traveling at 70 mph. (Decl. Marcus J. Ward ¶¶ 3, 4 (Apr. 13, 2016)

[Doc. #19-2].) Ward stopped the Nissan for failing to maintain lane control and following too closely. (Id. ¶¶ 5, 6.)

The vehicle was registered to Howze, the driver, who was able to provide his license and registration to Ward. (Id. ¶¶ 5-7.) After conducting a consensual search for weapons and finding none, Ward requested that Howze sit in the front passenger seat of his patrol car while he ran an intelligence check. (Id. ¶¶ 7, 8.) During casual conversation with Ward, Howze appeared nervous, gave short answers, yawned, and bounced his leg, and his hands were shaking. (Id. ¶ 8.) Howze said that he was on his way from Charlotte, North Carolina to Greensboro, North Carolina to see his girlfriend to "make a deposit" but was going back to Charlotte for work at 4:30 p.m. (Id.) For assistance, Ward contacted North Carolina State Troopers B.P. Daniels and S.L. Williamson who were responding to a separate incident on I-85. (Id. ¶ 9.)

After he issued Howze a warning ticket, Ward asked Howze if he had any questions; Howze said no and grabbed the door handle to leave. (Id. ¶ 10.) Ward then asked Howze if there were any reason he would be nervous; he said no. (Id.) Ward then asked if there was anything illegal like marijuana or cocaine in the vehicle, and Howze said no. (Id.) However, when Ward asked if there were large amounts of money in the vehicle, Howze paused and, in a low voice, said "um, yeah." (Id.) After prompted further, he said, "15 . . . 15 . . . $15,775"[1] and

---

[1] Eventually, the currency was taken to the State Employees Credit Union where it was counted and determined to be $15,795.00. (Decl. Ward ¶ 23.)

2

explained that the money was his and that he was going to use it to purchase a vehicle. (Id.) After Ward asked Howze if there were any weapons, methamphetamine, or medication in his vehicle, to which Howze responded "no", Howze consented to a search of the vehicle. (Id.) He told Ward that the money was in a bag in the back of the vehicle. (Id.)

By this time, Daniels and Canine Cappers had responded to Ward's request for assistance. (See id. ¶ 11.) Daniels is a canine handler assigned to the North Carolina State Highway Patrol Central Criminal Interdiction Unit and paired with Cappers, an eight-year old[2] Labrador – according to Daniels, a breed specifically selected for its keen senses and ability to be trained to detect the odor of controlled substances. (Decl. B.P. Daniels ¶¶ 1, 2 (Apr. 13, 2016) [Doc. #19-3].) Daniels has successfully completed the Basic Narcotic Canine Course at the Virginia State Police Academy and attended numerous seminars and training sessions which exposed him to basic and advanced police canine tactics, training, and animal behavior. (Id. ¶¶ 1. 2.) He and Cappers have completed thirteen weeks and approximately 455 hours of basic Canine Handler training with the Virginia State Police Canine Training Program, and, at the time of the traffic stop at issue here, Cappers was certified through the Virginia State Police. (Id. ¶¶ 2, 3.) Specifically, Cappers is trained to detect the presence of the odor of narcotics,

---

[2] At the time of the traffic stop and ensuing canine sniff, Cappers was not yet eight years old. (See Decl. David D. Peterson ¶ 13 (July 24, 2015) [Doc. #19-1] (describing Cappers as a seven-year old Labrador).)

3

including marijuana, hashish, heroin, methamphetamine, ecstasy, and powder and crack cocaine and has reliably detected large amounts of narcotics and United States currency concealed inside automobiles and elsewhere since being placed into service. (Id. ¶ 3.)

At Daniels' direction, Cappers conducted an outside sniff of the vehicle and displayed a positive alert to the presence of an odor of narcotics. (Id. ¶ 6.) Daniels and Cappers then returned to Ward's patrol car while Ward and Williamson searched the vehicle. (Id.; Decl. Ward ¶ 11.) Ward located a white Abercrombie and Fitch bag on the right rear floor behind the passenger seat which contained a plastic bag with a large amount of United States currency in a mixture of small and large denominations separated in fifteen bundles held by rubber bands. (Decl. Ward ¶ 11.) Ward and Williamson then placed the Abercrombie and Fitch bag along with three other bags found in the Nissan's trunk in a line formation on the roadside. (Id. ¶ 12.) Cappers displayed a noticeable and articulable change of behavior while passing the first bag and alerted by turning his head and body quickly back to the bag and sitting in final response by that bag. (Decl. Daniels ¶ 7.) The wind current and direction were northward, so after being praised off the first bag, Cappers traced the odor to its source at the third bag in the formation, the Abercrombie and Fitch bag containing the currency, and sat in final response with both ears perked and his tail wagging quickly, an alert to the presence of an odor of narcotics. (Id.)

4

At some point during the traffic stop,[3] Howze told Ward that he bought a 2005 E320 Mercedes-Benz about two weeks earlier and sold it at an auction on January 2, 2015 with the help of MJ whose telephone number Howze provided. (Decl. Ward ¶ 13.) Ward called MJ who did not know the amount of money for which the Mercedes-Benz had sold and was told to confirm the sale of the Mercedes-Benz with Ward as soon as possible. (Id.) Howze told Ward that he did not like to use banks and did not want to put his "flip" money in the bank.[4] (Id. at 14.) He further explained, because he did not feel safe keeping his money at his residence that he shares with his nephew and his nephew's girlfriend, that he was

---

[3] It is unclear from the materials before the Court precisely when in the course of the traffic stop Howze revealed the details of the vehicle purchase and sale. Howze's statements are presented in the order in which they are provided in Ward's Declaration, the only evidence of first-hand knowledge of these statements being made.

[4] Ward also says that "[d]uring the search of the Nissan Maxima[,] information from a bank account was found in the name of HOWZE with approximately a balance of $47,000.00 in the account[,]" information that Ward shared with Howze at which point Howze responded that he did not want to put the "flip" money in the bank. (Decl. Ward ¶ 14.) Although the government has provided copies of Howze's Bank of America checking and savings accounts from January 2013 through January 2015, neither account has or has had anywhere close to $47,000.00 in it. (See Bank of Am. Checking Statements [Docs. #19-5 to 19-7] & Bank of Am. Savings Statements [Doc. #19-12]). Howze responded to an interrogatory requesting the identity of every financial account he held or used since January 2009 by stating that his only financial account is the one with Bank of America for which he provided statements. (See Answer to Pl.'s Interrog. 6 [Doc. #19-4].) The Government has not provided the "information from a bank account" that was found during the vehicle search, and the Government has not otherwise used this information as part of its argument. Therefore, it is determined that this information is provided in Ward's Declaration simply to support the contradictory nature of Howze's explanations.

taking the money to his girlfriend's house until he could buy another vehicle at auction. (Id. ¶ 15.)

In the meantime, Ward gave the telephone numbers for MJ and Howze's girlfriend to David D. Peterson, Task Force Officer with the Drug Enforcement Agency in Greensboro in order to investigate and verify Howze's statements. (Id. ¶ 16; Decl. David D. Peterson ¶ 20 (July 24, 2015) [Doc. #19-1].) At approximately 11.36 a.m., Peterson contacted the "girlfriend" who initially stated only that Howze's name sounded familiar, but that she could not recall him. (Decl. Peterson ¶ 21.) After thinking about his name, though, she remembered him, but stated that she did not know him very well. (Id.) She had not spoken with him since the summer of 2014, was not expecting him or anyone else that day, and had never kept property for him. (Id.) Later that afternoon, at approximately 4:25 p.m., Peterson spoke with MJ who said he did not want to get involved and had not seen or spoken to Howze for a few months. (Id. ¶ 22.)

Howze was unable to provide bank statements, texts, emails, or bills of sale.[5] (Id. ¶ 23.) He explained that his cell phone would not show recent calls to his girlfriend, because he called her on a prepaid phone he had left at his residence, and he could not provide the number for the prepaid phone. (Id.) According to

---

[5] It is unclear when or precisely who asked Howze for this information; however, Ward stated that Howze was unable to provide these requested items to "TFO Peterson", (Decl. Ward ¶ 18).

6

Peterson[6], Howze continued to stumble with his words after being confronted with these discrepancies. (Id.)

Howze was not arrested, and no other purported contraband was found. (Decl. Ward ¶ 19.) The currency was taken to the Criminal Interdiction Unit Office in Winston-Salem, North Carolina where a post-seizure canine sniff of the currency was performed. (Id. ¶ 20; Decl. Daniels ¶ 8.) Outside the presence of Daniels, Ward set up five manila envelopes, one of which contained the currency, in a line formation. (Decl. Ward ¶ 21.) Daniels then deployed Cappers over the envelopes off lead. (Id. ¶ 22; Decl. Daniels ¶ 10.) As he did at the roadside with the currency in the Abercrombie and Fitch shopping bag, Cappers displayed a noticeable and articulable change of behavior as he passed by the envelope that contained the defendant currency and alerted to the odor of narcotics by quickly turning his head and body toward the envelope containing the currency and sitting in final response with both ears perked and his tail wagging quickly. (Decl. Ward ¶ 22; Decl. Daniels ¶ 10.) According to Daniels, Cappers' noticeable and articulable change of behavior was consistent with an alert to the presence of the odor of narcotics. (Decl. Daniels ¶ 10.)

---

[6] Although only Peterson makes this observation, it is not clear that Howze was actually in Peterson's presence or speaking with Peterson over the telephone. It is difficult to know if this observation is based on Peterson's first-hand knowledge.

7

B.

Howze does not dispute the events of January 7, 2015 as Ward, Daniels, and Peterson described them. But, he now presents a completely different explanation of the source of the currency and his intentions for the currency. He argues that the sources of the $15,795 in cash are savings from his employment, inheritance, and a tax refund and that his family has a practice of keeping cash on hand.

According to Howze, after being released from the custody of the Federal Bureau of Prisons on December 11, 2012 for conspiracy to sell and distribute cocaine, an offense to which he pled guilty in March 2003, he quickly obtained full-time employment. (Answer to Pl.'s Interrogs. 1, 2, 14 [Docs. #19-4, #25-4].) In January 2013, he began work as a machine operator at Wilbert Plastics in Belmont, North Carolina and worked hard to save money. (Answer to Pl.'s Interrog. 2.) His weekly paychecks from January 11, 2013 through the date of the traffic stop were direct deposited into his Bank of America checking account in varying amounts from several hundred dollars to, on occasion, over four hundred dollars each. (See Bank of Am. Checking Statements Jan. 11, 2013 – Jan. 23, 2015 [Docs. #19-5 to 19-7].)

It was Howze's practice to keep only enough money in his checking account to cover his basic expenses like gas, telephone, and food and entertainment. (Answer to Pl.'s Interrog. 2.) He lived with his sister and their grandmother and made neither rent nor mortgage payments. (Answer to Pl.'s Interrog. 8.) Monthly,

8

he contributed approximately $95 towards electricity and $100 towards water and spent approximately $80 to $100 a week on food and entertainment. (Id.) From October 2013 to July 2014, he made monthly payments of about $531 for a 2013 BMW X5. (Answer to Pl.'s Interrog. 7.) However, neither his checking nor his savings account reflects these payments having been made. (See Bank of Am. Checking Statements & Bank of Am. Savings Statements.) From July 2014 to at least January 2016, he owned the 2014 Nissan Maxima that he was driving on January 7, 2015 for which monthly payments were approximately $730 and for which he made a $1,282 down payment. (Answer to Pl.'s Interrog. 7; Bank of Am. Account Transaction History [Doc. #19-11]; E. Charlotte Nissan Purchase Option Contract [Doc. #19-8].) Although there is no apparent evidence of his having made payments on the BMW, he has made regular payments on the Nissan, beginning in September 2014, according to his loan statement. (See Bank of Am. Account Transaction History.) On September 9, 2014, $727.30 was transferred from his savings account to his car loan (Bank of Am. Savings Statement June 11, 2014 – Sept. 10, 2014), and, on October 31, 2014, $250.80 was transferred from his checking account to his car loan (Bank of Am. Checking Statement Oct. 25, 2014 – Nov. 20, 2014). However, there is no record of the other sources of his Nissan loan payments.

Because many members of his family had bank accounts frozen, according to both Howze and his sister, he and his family members kept their money primarily in cash. (Answer to Pl.'s Interrog. 2; Decl. Shontell D. Howze ¶ 4 (May

9

23, 2016) [Doc. #25-5] (explaining that she and her brother "were taught that it was important to keep cash on hand" because, among other things, "[a]ccess to credit and loans were difficult for many African American families" and that "[e]ven today, [she] keep[s] cash on hand for emergencies and to avoid potential difficulties with banks").) Indeed, for the first six months of 2013, Howze regularly withdrew hundreds of dollars in cash the same day he was paid, but, thereafter, he withdrew cash only every so often and, instead, used his debit card much more frequently. (See Bank of Am. Checking Statements Jan. 18, 2013 – June 7, 2013 & June 21, 2013 – Oct. 31, 2014.) He explained that he usually pays, presumably with his debit card, for friends and family when he is out with them and then they pay him back with cash. (Answer to Pl.'s Interrog. 2.)

In addition to saving approximately $4,000 in cash from his employment, Howze received $8,000 in cash when his grandmother died in October 2014. (Id.) His grandmother had saved approximately $17,000 or $18,000 in cash at her home by the time she died. (Id. (explaining that his grandmother had "saved about $17,000 in cash"); Decl. S. Howze ¶ 5 (noting that their grandmother had "left more than $18,000 in cash").) The family spent approximately $5,000 on her final expenses and debts before Howze and his sister split the remainder of the money. (See Answer to Pl.'s Interrog. 2; Decl. S. Howze ¶ 5.) Howze received

10

approximately $8,000, while his sister received approximately $6,000.[7] (See Answer to Pl.'s Interrog. 2; Decl. S. Howze ¶ 5.)

According to Howze, he "combined that $8000 with other money [he] was saving including the $3,207 [he] had received as a refund from [his] 2013 tax refund in March 2014 along with the approximately $4000 [he] had saved since beginning work at Wilbert Plastics in 2013." (Answer to Pl.'s Interrog. 2.) He deposited his 2013 tax refund into his checking account on March 19, 2014 and, on that same day, transferred $1,000 to his savings account. (See Bank of Am. Checking Statement Feb. 22, 2014 – Mar. 24, 2014; Bank of Am. Savings Statement Mar. 12, 2014 – June 10, 2014 [Doc. #19-12].)

Howze had been keeping the cash he had saved from his job and tax return, along with his inheritance, in a box under his bed. (Answer to Pl.'s Interrog. 16.) However, during the weekend of January 4, 2015, he noticed that it looked as though someone had tampered with his money. (Id.) Concerned the money was not safe there any longer, he took it to an old friend's house and put it in the trunk of her car in her garage, unbeknownst to her. (Id.) Howze did not want to keep the money there, so, on January 5, he called his friend Erica Hicks[8] in Greensboro. (Id.) Due to their conflicting work schedules, he did not go to see her until January

---

[7] Howze's sister's estimate of their grandmother's savings would have to be more accurate than Howze's estimate if the two split approximately $14,000 after spending approximately $5,000 on expenses and debt.

[8] Because the officers' declarations do not refer to Howze's girlfriend by name, it is unclear if Erica Hicks is the same woman with whom Peterson spoke on January 7.

11

7. (Id.) He also did not tell her he was coming, "but it was because [he] wanted her to keep [his] money safe since [he] was starting to feel that it wasn't safe at [his] house any longer." (Id.) When he was pulled over on January 7, he was on his way to Hicks' place of employment, a hospital in Greensboro. (Id.)

## II.

### A.

On July 27, 2015, the Government filed the instant action for forfeiture of the defendant currency (a) pursuant to 21 U.S.C. § 881(a)(6), alleging that it was furnished or intended to be furnished in exchange for a controlled substance, represents proceeds traceable to such an exchange, or was used or intended to be used to facilitate any violation of the Controlled Substances Act and (b) pursuant to 18 U.S.C. § 981(a)(1)(C), alleging that it constitutes or was derived from proceeds traceable to an offense constituting specified unlawful activity, as defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such an offense, specifically the exchange of a controlled substance in violation of state or federal law. (V. Compl. of Forfeiture ¶¶ 1, 2 [Doc. #1].)

Summary judgment can be appropriate in civil forfeiture cases. See, e.g., United States v. $864,400.00 in U.S. Currency, 405 F. App'x 717 (4th Cir. 2010) (unpublished) (affirming the grant of summary judgment in a civil forfeiture action). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if a reasonable jury, based on

the evidence, could find in favor of the non-moving party. See United States v. $147,900.00 in U.S. Currency, 450 F. App'x 261, 264 (4th Cir. 2011) (unpublished) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The materiality of a fact depends on whether the existence of the fact could cause a jury to reach different outcomes. See Anderson, 477 U.S. at 248. A court considering a summary judgment motion must view the facts and draw reasonable inferences from the evidence before it in the light most favorable to the non-moving party. See id. at 255.

Pursuant to the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), the government bears the initial burden of establishing, by a preponderance of the evidence, that the defendant property is forfeitable. 18 U.S.C. § 983(c)(1). Here, for summary judgment purposes, the Government contends that the defendant currency is forfeitable pursuant to 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(C) because it is proceeds from the exchange of a controlled substance or other specified unlawful activity or was used or intended to be used to facilitate the commission of a violation of the Controlled Substances Act.[9] (Mem. in Supp. of Gov't's Mot. for Summ. J. at 12.) To establish its burden, the government may use evidence it acquired after filing its complaint for forfeiture. 18 U.S.C. §

---

[9] The Government is proceeding at summary judgment with these two theories, although in its Verified Complaint for Forfeiture, it also alleged that the currency was "furnished or intended to be furnished in exchange for a controlled substance in violation" pursuant to 21 U.S.C. § 881(a)(6). Compare V. Compl. for Forfeiture ¶ 1 with Mem. in Supp. of Gov't's Mot. for Summ. J. at 12.

13

983(c)(2). The court "should not view each piece of evidence in isolation, but rather consider the totality of the evidence as a whole and in the appropriate context." $147,900.00, 450 F. App'x at 263.

If the government meets its burden, the burden shifts to the claimant to show, by a preponderance of the evidence, that he is an "innocent owner" of the defendant property. 18 U.S.C. § 983(d); $864,400.00, 405 F. App'x at 718. What the claimant must establish depends on when his interest in the property arose. While in his Answer [Doc. #9] and his Brief in Response and Opposition to Plaintiff's Motion for Summary Judgment [Doc. #25] Howze generally asserts that he is an innocent owner pursuant to 18 U.S.C. § 983(d)(1), he does not specify whether he is an innocent owner whose interest in the property existed "at the time of the illegal conduct giving rise to the forfeiture", 18 U.S.C. § 983(d)(2), or whose interest was "acquired after the conduct giving rise to the forfeiture has occurred", 18 U.S.C. § 983(d)(3). Because Howze argues that his money was derived from legitimate sources, it is determined that he is claiming that his interest in the cash to which Cappers alerted as having the odor of narcotics was acquired after it would have come in contact with narcotics. Therefore, relevant to this case, a claimant who acquired his interest in the property "after the conduct giving rise to the forfeiture has taken place" must establish that he "was a bona fide purchaser" and "did not know and was reasonably without cause to believe that the property was subject to forfeiture." 18 U.S.C. § 983(d)(3)(A).

14

B.

Here, the Government has met its burden of establishing by a preponderance of the evidence that the defendant currency is proceeds from the exchange of a controlled substance pursuant to 21 U.S.C. § 881(a)(6). The Government also alleged and argued that the currency was used or intended to be used to facilitate a violation of the Controlled Substance Act pursuant to 21 U.S.C. § 881(a)(6). However, "[i]f the government's theory is that the property was used in or facilitated the commission of a criminal offense, . . . the government must also prove that there was a substantial connection between the property and the offense." United States v. Munson, 477 F. App'x 57, 65 (4th Cir. 2012) (unpublished) (citing 18 U.S.C. § 983(c)(3)); see also Asset Forfeiture Policy Manual 71 (U.S. Dep't of Justice 2016) (explaining the purpose and importance of the Department of Justice's policy regarding civil forfeiture actions against "facilitating property" by distinguishing it from property that is proceeds of a crime), https://www.justice.gov/criminal-afmls/file/839521/download.[10] Here, the Government has not argued or proffered evidence of a substantial connection between the defendant currency and the underlying criminal activity; however,

---

[10] In some cases, even when the government is not pursuing the theory that the defendant currency facilitated the commission of a crime, courts use the substantial connection test, yet cite cases in support of the application of that test in which the government is arguing that the defendant property facilitated the commission of a crime. An analysis of the law leads this Court to apply the substantial connection test only to the Government's theory that the defendant currency was used to facilitate the commission of a crime, not to its theory that the defendant currency is proceeds of a crime.

15

because it has met its burden of establishing that the currency is proceeds of criminal activity, it need not also meet its burden with respect to its argument that the defendant currency is facilitating property.

On the one hand, this case differs from other civil forfeiture actions involving defendant currency discovered as part of a traffic stop in that (a) Howze was driving his car – properly registered to him, and not a rental car, (b) the Government has not argued that his departure and destination locations were known drug trafficking hubs, (c) Howze did not deny the presence of the currency, but instead admitted to its presence and stated its amount, and (d) Howze did not attempt to hide the currency either from the officers or within the body of his car, but instead told Ward that the money was in a bag in the back of his vehicle. See, e.g., United States v. $119,030.00 in U.S. Currency, 955 F. Supp. 2d 569 (W.D. Va. 2013) (involving circumstances in which one claimant was driving a rented vehicle when he denied the presence of, among other things, a large amount of currency before the officers found $119,030 behind the door panel that, together with other facts, sufficiently supported the government's burden); United States v. $864,400.00 in U.S. Currency, No. 1:05CV919, 2009 WL 2171249 (M.D.N.C. 2009), aff'd, 405 F. App'x 717 (involving circumstances in which the claimant and his driver were traveling in a rental car between a known drug destination and a major drug trafficking hub with $864,400 in United States currency hidden in the passenger door panel that, together with other facts, sufficiently supported the government's burden).

However, the totality of the circumstances here favor the Government. The currency was contained in a plastic bag within the Abercrombie and Fitch shopping bag in fifteen bundles held by rubber bands. Cappers, about whose training, certification, skills, and reliability Daniels has attested, alerted three separate times to the odor of narcotics. First, during an outside sniff of the vehicle, he alerted to the presence of an odor of narcotics. Then, at the roadside, after alerting to the odor of narcotics while passing the first bag in the formation, he traced the source of the odor to the Abercrombie and Fitch bag holding the currency. Finally, at the Criminal Interdiction Unit Office, he alerted to the odor of narcotics at the one envelope that contained the defendant currency. In addition, Howze has a history of having violated the Controlled Substances Act, as he pled guilty to conspiracy to sell and distribute cocaine in March 2003 for which he served over nine years in federal prison. Perhaps most important, though, is Howze's knowingly false statements to Ward about the source of and his intentions with the currency. Instead of explaining to Ward that the currency included cash from his job, tax refund, and inheritance that he was saving and keeping on hand because his family has a practice of doing so – as he now does, he told Ward that he and MJ recently purchased a Mercedes-Benz that they then sold at auction and that he was holding on to the cash to buy another vehicle at auction, an explanation that MJ did not corroborate. Furthermore, Howze has now silently disavowed that story in pursuit of his present explanation, although not denying that he made those statements to Ward.

17

The totality of these circumstances makes it more likely true than not that the defendant currency is subject to forfeiture as proceeds of a drug offense. See, e.g., $147,900.00, 450 F. App'x at 264 (noting, among the evidence that some of the defendant currency was connected to drug activities, the claimant's "history of involvement with illegal drugs" when they were found on his property four years prior to and the same year as the traffic stop that led to the discovery of the defendant currency); United States v. $14,800.00 in U.S. Currency, No. ELH-11-CV-3165, 2012 WL 4521371, *7 (D. Md. Sept. 28, 2012) (listing factors "probative of whether currency is substantially connected to a violation of the CSA" as "the amount and denomination of the property; the packaging of the currency; the behavior of the individual in possession of the currency, including the individual's explanation for possessing the currency, whether the individual denied possessing the currency, and whether the individual appeared nervous or changed stories; whether a trained narcotics dog alerted to the currency or the location in which the currency was discovered; and whether the claimant has a lawful source of income"); $864,400.00, 2009 WL 2171249 at *3 (finding the government met its burden where the claimant and driver carried a large amount of cash bundled in a particular way hidden in the door panel of their rental car, lied to the officer in an attempt to conceal the presence of the cash, exhibited nervousness, gave a vague and highly implausible explanation of the cash, and traveled from a known drug destination to a major drug trafficking hub and two separate trained canines alerted to the odor of narcotics on the car).

While the Government has met its burden, Howze has not.[11] There is evidence that Howze is employed full-time, has his weekly paycheck regularly deposited into his checking account, received a $3,207 tax refund in March 2014, withdrew large sums of cash regularly until June 2013 when he began using his debit card more often – presumably for some purchases for his friends and family in return for which they gave him cash, inherited approximately $8,000 in October 2014, and follows his family's practice of keeping cash on hand. He also maintains a balance in both his checking and savings accounts to pay for electricity, water, and food and entertainment, but, according to his bank statements, those expenses are not paid directly from either account by check or automatic payment. There are also other expenses that are not reflected as having been paid directly from either Howze's checking or savings account. Those include monthly payments from October 2013 to July 2014 of $531 for his BMW, his $1,282 down payment for his Nissan, monthly payments from October 2014 to

---

[11] As part of his "Statement of Facts", Howze contends that "he may be the last person in the United States to be subject to property forfeiture under circumstances such as those related to his stop and that are the subject of this litigation" because of Attorney General Eric Holder's January 16, 2015 Order entitled "Prohibition on Certain Federal Adoptions of Seizures by State and Local Law Enforcement Agencies." (Br. in Resp. & Opp'n to Pl.'s Mot. for Summ. J. ("Br. in Opp'n") at 1-2 [Doc. #25].) Despite attaching three exhibits in further explanation of this contention (see Exs. 1-3 to Br. in Opp'n [Docs. #25-1 to 25-3]), Howze properly recognizes that the new policy does not affect the instant action because the date of federal adoption of Howze's property is considered to be January 13, 2016 (see Ex. 1 to Br. in Opp'n), two days before the effective date of the Attorney General's Order which was to be applied prospectively (see Ex. 2 to Br. in Opp'n).

January 2015 of approximately $730 for his Nissan (with the exception of $250.80 transferred from his checking account to his loan on October 31, 2014), and monthly payments of $62 for one year for furnishings (see Experian Credit Report at 11 [Doc. #19-8]).  In other words, although Howze had saved money in the form of cash from his employment, tax refund, and inheritance, his expense payments are not accounted for as debits to his checking or savings account, which suggests that he is paying for those obligations with his accumulated cash on hand.  Most problematic for Howze's ability to meet his burden by a preponderance of the evidence that he is an innocent owner, though, is the fact that he knowingly made a false statement to Ward when given the opportunity to explain the source and purpose of the defendant currency.  In sum, the evidence is not such that a reasonable jury could return a verdict for Howze.

Because the Government has met its burden, and Howze has not met his, summary judgment in favor of the Government is appropriate.

III.

For the foregoing reasons, IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment [Doc. #18] is GRANTED.

This the 15th day of June, 2016.

/s/ N. Carlton Tilley, Jr.
Senior United States District Judge